1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

CAROL VAUGHN, in her representative
capacity as Personal Representative of the
ESTATE OF MICHAEL COHEN,

Plaintiff
Counter Defendant
Third Party Defendant
Cross Defendant,

v.

LOREN COHEN, et al.,

Defendants
Counter Plaintiffs

***

WILLIAM NEWCOMER,

Plaintiff
Counter Defendant,

v.

LOREN COHEN, et al.,

Defendants
Counter Plaintiffs
Third Party Plaintiffs,

v.

Case No. 3:23-cv-06142-TMC

ORDER DENYING LOREN COHEN'S
MOTION FOR SUMMARY JUDGMENT

AMARA COHEN, individually, and SUSAN
COHEN, Trustee of the Michael Arthur
Cohen Spousal Equivalent Access Trust,
CAROL VAUGHN, individually, and in her
representative capacity as Personal
Representative of the ESTATE OF
MICHAEL COHEN, UNITED STATES OF
AMERICA (DEPARTMENT OF
INTERNAL REVENUE), and BR
NEWCOMER, LLC

Third Party Defendants
Counter Defendants
Counter Plaintiffs.

## I.    INTRODUCTION

This action arises from a creditor dispute concerning the Estate of Michael Cohen. The case was removed to this Court by the United States after it was named as a Third-Party Defendant in the state court action. Dkt. 1. Before the Court is Defendant Loren Cohen's Motion for Summary Judgment on the Estate's claims against him based on undue influence, breach of fiduciary duty, and violations of the Uniform Voidable Transactions Act ("UVTA"). Dkt. 142. Carol Vaughn, in her capacity as Personal Representative of the Estate, responded, Dkt. 191, and Loren[1] replied, Dkt. 203. The Court heard oral argument on March 14, 2025. Dkt. 227. Having reviewed the briefing, and the balance of the record, the Court DENIES the motion.

The Court recognizes that, at the end of oral argument, it gave the parties a preliminary ruling that it planned to grant the motion with respect to the undue influence claims while otherwise denying it. Upon additional review of the record, however, and as explained further below, that preliminary ruling was based on a misunderstanding of one of the documents filed in support of the motion, Dkt. 143-17. While the Court apologizes to the parties for the confusion

[1] As with its prior orders in this case the Court refers to members of the Cohen family by their first names to avoid confusion.

ORDER DENYING LOREN COHEN'S MOTION FOR SUMMARY JUDGMENT - 2

1  and its potential effect on trial preparations, the Court retains the power to reconsider its own

2  interlocutory rulings at any time and must ultimately ensure that its rulings reflect a correct

3  understanding of the material facts. *See Amarel v. Connell*, 102 F.3d 1494, 1515 (9th Cir. 1996),

4  *as amended* (Jan. 15, 1997) ("Interlocutory orders and rulings made pre-trial by a district judge

5  are subject to modification by the district judge at any time prior to final judgment.") (cleaned

6  up).

7                                    **II.    BACKGROUND**

8  **A.    Factual Background**

9          The following material facts are based on the evidence in the record, viewed in the light

10  most favorable to the nonmoving party, as well as allegations in the pleadings that are

11  undisputed. Given the extensive record, this summary is illustrative and not an exhaustive list of

12  the disputed material facts.

13          *1.    The 2014 Transfer Agreement*

14          Michael was a general contractor and property developer who owned numerous

15  construction and real estate development business entities. Dkt. 2-1 ¶¶ 1, 34–35. Following his

16  divorce from Julie McBride, Michael became the sole owner of M&J Real Estate Investment

17  LLC (the "Company"). Dkt. 11-1 at 43.

18          In June 2014, Michael and his adult son, Loren, signed an agreement through which

19  Michael transferred a 50.1 percent interest in the Company to the LMC Family Trust.[2] *Id.* at 43–

20  44. The 2014 agreement valued the 50.1 percent interest at $11,310,000. *Id.* at 44. The agreement

21  provided that the Company would grant Michael a "Preferred Return" equal to the value of the

22  transferred interest. *Id*. Half the value of the Preferred Return, however, would be diluted over

23  _____

24  [2] The LMC Family Trust was created by Michael, the grantor, for the benefit of Loren. Dkt. 141-7 at 9. Loren was also designated as its Trustee. *See* Dkt. 11-1 at 43.

ORDER DENYING LOREN COHEN'S MOTION FOR SUMMARY JUDGMENT - 3

the course of ten years in exchange for Loren's executive management of the company. *Id*. The dilution amount was $565,500 per year. *Id*.

       2.     *Negotiation of the 2020 Transaction*

       In January 2020, Michael was diagnosed with esophageal cancer. *Id.* at 679. He began estate planning with his attorney Kyle Johnson and Loren, which included finalizing Michael's will and a successor trustee agreement for a trust for Michael's wife, Amara, and their minor children. *See generally* Dkt. 144-2. On August 17, 2020, Loren emailed Johnson, "Mike and I have been talking a bit about the idea of the conveying the remainder of his business interests to Lee Cohen and I, as we are convinced it's better for this transaction to occur outside of the estate." *Id.* at 10. Loren asked Johnson to draft a purchase contract modeled after the one used for the initial 50.1 percent interest transfer from 2014. *Id.*

       In late August 2020, Michael was hospitalized at Tacoma General Hospital. There was a palliative medicine consult on August 27, for which a chart note reports that Michael "has been working on estate planning and has said goodbyes to friends and family and is at peace if it is his time to die." Dkt. 151-1 at 113. On August 28, Loren sent Johnson and Michael a draft transfer agreement. Dkt. 144-2 at 13–14. The same day, the chart notes reflect that Michael was being treated with morphine and oxycodone and felt "groggy and confused after taking oxycodone." Dkt. 151-1 at 113. The next day, August 29, a pulmonary and critical care note reported Michael's status as "critically ill w/ hypoxemic respiratory failure." *Id*.

       At some point during this hospitalization, Michael signed a version of the transfer agreement dated August 28, 2020. Dkt. 11-1 at 73–80. Viewed in the light most favorable to the nonmoving party, Michael and Loren's contemporaneous emails suggest that (1) despite the August 28 date, the agreement was likely signed a few days later, and (2) Michael wanted further edits, but Loren convinced Michael to sign some version of the agreement in case his death was

imminent. *See* Dkt. 144-2 at 19–38. For instance, on August 29, Loren urged Johnson to finish his edits as soon as possible given Michael's worsening condition. *Id.* at 18 ("We've heard from some doctors that this thing could happen any day now . . . time is likely not on our side right now to get these docs down."). The next day, Johnson responded that he was "on it," but asked Loren, "Is there any reason not to sign your version of the transfer agreement? I know it basically accomplishes Mike's objectives." *Id.* at 27. On August 30, Loren sent Michael and Johnson an updated version accompanied by a screen shot showing how he had calculated the Remaining Preferred Return owed under the 2014 Agreement. *Id.* at 39. On August 31, Loren sent Michael and Johnson an updated transfer agreement which included "Mike's request for a minimum payment monthly and annual payment (minimum of $5k monthly, $160k annual)." *Id.* This Remaining Preferred Return calculation and the minimum payment provision appear in the signed agreement dated August 28, suggesting it was signed or drafted later than stated. *See* Dkt. 11-1 at 75–76.

On September 5, after Michael's health had stabilized somewhat, Johnson informed Loren, "Mike and I have spent time this morning talking through some of his concerns" and changes Michael wanted to the transfer agreement. Dkt. 144-2 at 47. Johnson explained that Michael wanted to add language "providing that 50% of all marketing fees received will be applied to preferred distributions that are owed to him" and wanted "the indemnification language expanded to include him personally as well as his estate." *Id.* Johnson further noted that Michael wanted his preferred distribution debt paid as soon as possible. *Id.*

On September 11, Michael emailed Loren and Johnson asking about the status of revisions to the transfer agreement. *Id.* at 52. On September 16 and 17 Michael again asked Loren to send him "the revised Transfer Agreement." *Id.* at 53, 61. Michael requested again on

September 30, "a quick recap of status and latest drafts," including "Transfer agreement, pls send latest draft, have you made any edits since we met in the hospital?" *Id.* at 64.

The record does not reflect any response from Loren about the transfer agreement between September 1 and September 30. On September 30, Loren finally responded: "Transfer Agreement: This document was executed on August 28, 2020 and has not been amended since."[3] *Id.* Michael wrote back within minutes: "I don't agree that the Transfer Agreement was complete or executed. I do know we talked about additions to it that I believe we generally agreed to and you told me you would draft and you asked me as a convenience to sign while you were there at the hospital." *Id.*

Within an hour, Loren responded in a longer email that a reasonable factfinder could characterize as both defensive and intimidating. Loren insisted the agreement was "mutually executed without condition," that the timing was only "because the deal was done and ready to be completed," and that "[t]he fact you were in the hospital seems to be beside the point"— despite Loren's earlier emails to Johnson clearly stating he wanted the documents signed because Michael was critically ill. *Id.* at 66; *see id.* at 18. Loren accused his father of "raising this issue in an attempt to argue you were not competent and/or of sound mind to sign this document," and described that as a "slippery slope . . . because you were making dozens if not hundreds of other business decisions during this same period of time." *Id.* at 66. Loren also asserted that changes to the transfer agreement would require unwinding a separate agreement for the companies to pay a $1 million "bonus" to his brother Lee, and he chastised his father for copying Susan Cohen— Michael's sister and the trustee of the trust for Michael's wife and minor children—on "such sensitive communications." *Id.* Nevertheless, Loren closed by writing, "if you believe [the

---

[3] As explained above, the parties' contemporaneous emails give reason to doubt the truth of this statement.

transfer agreement] needs to be edited then please suggest these changes. Attached is a Word version for ease of editing." *Id.*

Michael wrote back, "I disavow the notion the agreement was complete and executed." *Id.* He explained, "I believe I was of sound mind in the hospital. I also had to reconcile that there was a chance my health could go South and I would not survive . . . All of that as well as my always enduring love and confidence in you allowed me to honor your request to sign while you were with me in the hospital." *Id.* He closed, "I will work with Kyle to offer edits [for] your approval." *Id.*

On October 4 and 5, Loren, Michael, and Johnson continued negotiating the transfer agreement. *See id.* at 74–77. Loren provided his thoughts on Michael's proposed changes and stated that he believed the changes should be incorporated as an amendment to the August 28 transfer agreement rather than directly editing the earlier version. *Id.* at 74. Loren and Michael continued to disagree about how quickly the remaining Preferred Return from 2014 would be paid and what other consideration would be credited against the Preferred Return. *See id.* During these discussions, Johnson asked Loren for a copy of the signed August 28 agreement, noting "I've heard about it but never seen it." *Id.* at 76.

On October 4, Susan recorded a conversation between Amara and Michael where Michael said that having Loren inherit the businesses "could create tax issues, so we came up with the plan that I'm very comfortable with to just go ahead and transfer it to him now. I'm transferring it to him . . . for no money, that million 250 or whatever the number is, is what he owed me from the previous transfer." Dkt. 144-6 at 6. Michael assured Amara that "He owes us that cash and . . . we've got it written out very clearly how he's going to make those payments . . . He makes a monthly payment, a yearly payment, and then when certain other monies come in, he has to make those payments." *Id.* at 6–7.

But Michael and Loren had not reached agreement on the details of those payments. On October 6, Johnson wrote to Loren that he and Michael had reviewed Loren's comments and "for the most part" agreed. Dkt. 144-2 at 84. Johnson noted, however, that "Mike feels pretty strongly that what you refer to as the original agreement that he signed . . . was not set in stone and was not binding. That said, your drafting approach of referring to it as the original agreement *is acceptable to him as long as agreement on the amendment is achieved*." *Id.* (emphasis added). Johnson outlined remaining disagreements about the CWS investment, payments on the Preferred Return, and credits against the Preferred Return—all of which went to the consideration for the agreement and Michael's objective of maximizing payments to the trust and benefits for his wife and minor children. *See id.* On October 9, Michael wrote to his ex-wife (Loren's mother):

> As a result of my health, I have been engaging in estate planning to include transfer of all my business interests to Loren. He would have inherited this upon my death so we determined it was better to consummate the transfer now. No payment is associated with this transfer. The business is quite challenging at the moment and after the transfer that is happening now, I am left with little resources to continue payments.

Dkt. 143-13 at 2.

After additional back and forth between Loren and Michael, *see* Dkt. 144-2 at 93–96, 99–103, Loren emailed Michael and Johnson a copy of the August 28 transfer agreement and his proposed amendment on October 29 and 30, *id.* at 104, 107. Johnson testified that Loren "basically took over the drafting of the agreement." Dkt. 193-3 at 8. On November 2, Michael sent redline edits of the amendment to Loren, showing the changes he still wanted. Dkt. 144-4 at 2–7. Those changes included (1) that any remaining compensation paid to Michael before his death would not be credited against the Preferred Return owed to his wife's trust; (2) that certain revenue from the Rainier Condominiums investment would be paid toward the Preferred Return

monthly; and (3) that health insurance and cell phone coverage for Michael's wife and minor children would not be credited against the Preferred Return. *See id.*

Two days later, on November 4, Loren wrote back objecting to Michael's proposed changes: "Dad, I don't like your edits… it doesn't make a lot of sense to me for continued and ongoing payments made to you and on Amara's behalf not to count against the Remaining Pref. Return." *Id.* at 8. "The bottom line is that if you live 10 years that would be a ton of money, and on principal it flies in the face of the fact that I'm now economically responsible for making all this shit fly… Thoughts?" *Id.* A reasonable factfinder could conclude that this email was disingenuous considering Michael's terminal illness and declining condition.

After Michael wrote back, "[l]et's discuss," *id.* at 14, there is no remaining written evidence in the record of the negotiations. Michael was hospitalized for several days in November. *See* Dkt. 144 at 5; Dkt. 173-2. Thanksgiving Day was on November 26, 2020. Lee Cohen testified that though his father was frail and on oxygen, he felt well enough that day to drive himself to the store. Dkt. 143-9 at 11. In a declaration, Lee attested that his father remained mentally sharp until the final days of his life. Dkt. 145 at 6. Michael's financial advisor testified that Michael directed their last phone conversation on November 11, and he did not notice any diminishment in Michael's mental state. Dkt. 148 at 3. According to Loren, Michael signed the final transfer agreement with a digital signature on either November 27, 28, or 29. Dkt. 143-16 at 9–10. Loren testified that he and Michael signed in his Michael's home office, and he could not recall anyone else present. *Id.* Susan testified that Loren told her he had Michael sign the day he took Michael to the hospital before he died. Dkt. 193-6 at 7.

Medical records show that on November 29, Michael "was sitting up in bed and witnessed to have loss of consciousness with shaking of the torso for about 20 seconds" and "Son also noticed that [Michael] had gait imbalance . . . Son also reports that [patient] seems

more confused the last few days [with] more pronounced short-term memory problems. He also

had trouble understanding some simple commands." Dkt. 173-2 at 28. After being admitted to

the hospital the next day, Michael was alert and oriented, and he elected hospice care. *Id.* at 29.

He was transferred home on December 5 and died the next day. *Id.*

3.    *Details of the 2020 Transaction*

The two agreements—the 2020 agreement and amended agreement (together, the "2020

Transaction")—transferred Michael's remaining business interests to Loren. Dkt. 11-1 at 74. The

2020 Transaction provided that any amount of the Preferred Return still owing to Michael would

be gifted to the MAC Trust, a trust set up for Michael's wife Amara and his two minor children.

*Id.* It provided that one of the companies controlled by Loren would hold one of its investments

"as nominee on behalf of the MAC Trust." *Id.* at 74–75, 83. After stating that "the value of the

Company has greatly declined since the making of the Original Transfer Agreement [in 2014],"

the 2020 Transaction provided that in consideration for receiving the remaining business

interests, Loren would guarantee that the companies "will pay any amount of Preferred Return

still remaining due." *Id.* at 75. The agreement then calculated the "Remaining Preferred Return"

from the 2014 Agreement as $1,257,170.67. *Id.* at 75, 83–84. As "additional consideration," the

companies now controlled by Loren agreed "to indemnify MAC Trust and [Michael] from any

and all claims or liabilities arising from any business disputes related to [the companies],

including any and all personal guarantees of [Michael]"; continue paying Michael his salary and

benefits until he died; pay a $1,000,000 "bonus" to Michael's other adult son, Lee; and pay for

cell phone service and health insurance coverage for Amara and the two minor children for a

period of time. *Id*. at 84–85.

But the final agreement, purportedly signed by Michael a few days before his death,

differed in several material ways from the last version that Michael proposed on November 2,

2020—and each one of those differences was more favorable to Loren and less favorable to Michael. Those changes can be summarized as follows:

- Michael had asked that compensation paid to him before his death not be credited against the Remaining Preferred Return; the final agreement rejects this proposal. *Compare* Dkt. 144-4 at 5 *and* Dkt. 11-1 at 84.

- Michael had asked that fifty percent of certain revenues from the Rainier Condominiums be paid toward the Remaining Preferred Return monthly as received; the final agreement rejects this proposal. *Compare* Dkt. 144-4 at 5 *and* Dkt. 11-1 at 84.

- Michael had asked that health insurance and cell phone coverage for Amara and their children not be credited against the Remaining Preferred Return; the final agreement rejects this proposal. *Compare* Dkt. 144-4 at 6 and Dkt. 11-1 at 85.

In addition, the final agreement includes several other material changes that are favorable to Loren, for which the record contains no evidence of negotiation with Michael, and which did not appear in earlier versions of the agreement. Those changes can be summarized as follows:

- The guaranteed annual minimum payment toward the Remaining Preferred Return was reduced from $160,000 to $100,000. *Compare* Dkt. 144-4 at 5 *and* Dkt. 11-1 at 84.

- The salary cap for Loren and his wife, above which they would have to pay dollar-for-dollar toward the Remaining Preferred Return, was increased from $450,000 to $550,000. *Compare* Dkt. 144-4 at 5 *and* Dkt. 11-1 at 84.

- The Rainier Condominium revenue would be paid toward the Remaining Preferred Return only when the salary cap was exceeded. *Compare* Dkt. 144-4 at 5 *and* Dkt. 11-1 at 84.

All these changes appear contradictory to Michael's intent, as expressed throughout his contemporaneous emails, to maximize the consideration and benefits for his wife and minor children and to ensure that the Remaining Preferred Return was paid as quickly as possible. *See e.g.*, Dkt. 144-2 at 47.

1

2    *4.    Probate Proceedings*

3        After Michael's death, Loren was appointed as personal representative ("PR") of

4    Michael's estate until he was later removed in December 2021. Dkt. 126-1; Dkt. 126-3. On May

5    21, 2021, while Loren was PR, he entered into a settlement agreement with some of Michael's

6    former business partners, the Thomsens, that settled litigation between the Thomsens, the Estate,

7    Loren and his wife, and several Cohen companies. *See generally* Dkt. 144-13. Under this

8    agreement, Point Ruston LLC was required to pay the Thomsens $26,000,000, but if a payment

9    of $12,000,000 was made on or before September 15, 2021, the principal balance would be

10   reduced from $26,000,000 to $9,000,000. *Id.* at 7–8; *see Starr Indem. & Liab. Co. v. PC

11   Collections, LLC*, 25 Wn. App. 2d 382, 390–91, 523 P.3d 805, *review denied sub nom. Thomsen

12   Ruston, LLC v. Point Ruston, LLC*, 534 P.3d 805 (Wash. 2023). The agreement also included an

13   $8,000,000 covenant judgment against the Estate. Dkt. 144-1 at 14. In a filing to the probate

14   court, Loren asserted that he has paid at least $12,000,000 to the Thomsens to fulfill the

15   settlement agreement. *Id.*

**B.    Procedural Background**

16       On July 7, 2023, the Estate filed suit against Loren, his marital community, and his

17   family trust in the Superior Court of the State of Washington for Pierce County. Dkt. 1-4. The

18   Estate filed an amended complaint on October 18, 2023, Dkt. 2-1, and the action was later

19   removed to this Court by Third-Party Defendant the United States, Dkt. 1.

20       After a protracted motions practice, the Estate filed a Third Amended Complaint that

21   asserts the following claims against Loren: (1) violations of the UVTA under RCW 19.40; (2)

22   declaratory judgment that the 2020 Transaction was a product of undue influence; and (3) breach

23   of fiduciary duty to Michael. Dkt. 108; *see* Dkt. 102; Dkt. 106.

24

On October 23, 2024, the Estate disclosed three expert witnesses—Dr. Jennifer L. Piel, Arik K. Van Zandt, and Wendy Goffe. Dkt. 89. Dr. Piel submitted three expert reports, including a rebuttal report to Dr. Elaine Peskind, opining that Michael met the statutory definition of a vulnerable adult and was vulnerable to undue influence when he executed the 2020 Transaction. Dkt. 151-2 at 3–49, 89–123, 217–223. Loren retained Dr. Elaine Peskind who opined that Michael was not cognitively impaired when he executed his estate documents. Dkt. 151-1 at 99–151. Mr. Van Zandt submitted an expert report and a rebuttal report to Brinette C. Bobb, opining that the fair value of the Company was estimated between $17,600,000 and $20,000,000 as of August 30, 2020, the valuation date. Dkt. 138-30 at 8–27; Dkt. 138-31. Loren's experts Tom Bucknell and Kimberly Linebarger disagreed, opining that the Company had many liabilities and questioning Mr. Van Zandt's appraisal estimate. Dkt. 143-2 at 2–15; Dkt. 143-3 at 2–12. Wendy Goffe submitted three expert reports, including two rebuttal reports to Susan N. Gary and Brinette C. Bobb. Dkt. 141-5 at 2–23; Dkt. 141-6 at 2–25; Dkt. 141-7 at 2–23. Goffe opined that Vaughn carried out her fiduciary duties by not committing waste and acting impartially to all beneficiaries and creditors. *Id.* In contrast, Loren's expert Susan N. Gary opined that Vaughn's decision to sue Loren breached her fiduciary duties Dkt. 143-6 at 2–43.

Loren moves for summary judgment on all of the Estate's claims as well its affirmative defenses to his counterclaims. Dkt. 142. As set forth in the rest of this order, the Court concludes that questions of witness credibility and other disputed material facts require it to deny the motion. Because, by separate order, the Court dismisses Loren's counterclaims against the Estate and the PR, his request for summary judgment on the affirmative defenses is moot.

### III.    SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

Civ. P. 56(a). A dispute as to a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The moving party has the initial burden of "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). In this case, the Court notes that many of the disputed material facts are contained within the materials submitted by Loren in support of his motion, and therefore he has not met his initial burden.

If the moving party meets its initial burden, the nonmoving party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248. The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of a claim in the case on which the nonmoving party has the burden of proof. *Celotex*, 477 U.S. at 323.

## IV.    DISCUSSION

### A.    UVTA Claims

"[T]he overriding purpose of the [UVTA] is to provide relief for creditors whose collection on a debt is frustrated by the actions of a debtor to place the putatively satisfying assets beyond the reach of the creditor." *DZ Bank AG Deutsche Zentral-Genossenschaft Bank v. Meyer*, 869 F.3d 839, 842 (9th Cir. 2017) (citing *Thompson v. Hanson*, 167 Wn. 2d 414, 424, 219 P.3d 659, *as amended* (Mar. 26, 2010), *republished as modified at* 168 Wn. 2d 738, 239 P.3d 537 (2009)). A UVTA claim may be brought based on actual fraud under RCW 19.40.041(a) or constructive fraud under RCW 19.40.041(1)(b) or RCW 19.40.051. *See Clayton v. Wilson*, 168 Wn. 2d 57, 68, 227 P.3d 278 (2010) (identifying actual fraud and constructive fraud under the UVTA as separate cause of actions).

1

*1.    Constructive fraud under the UVTA*

A transfer may constitute constructive fraud with respect to claims arising *after* the

transfer if the debtor made the transfer

> [w]ithout receiving a reasonably equivalent value in exchange for the transfer or
> obligation, and the debtor (i) Was engaged or was about to engage in a business or
> a transaction for which the remaining assets of the debtor were unreasonably small
> in relation to the business or transaction; or (ii) Intended to incur, or believed or
> reasonably should have believed that the debtor would incur, debts beyond the
> debtor's ability to pay as they became due.

RCW 19.40.041(1)(b). When a creditor's claim arises *before* the transfer, a transfer constitutes

constructive fraud "if the debtor made the transfer or incurred the obligation without receiving a

reasonably equivalent value in exchange for the transfer or obligation and the debtor was

insolvent at that time or the debtor became insolvent as a result of the transfer or obligation" or

"the transfer was made to an insider for an antecedent debt, the debtor was insolvent at that time,

and the insider had reasonable cause to believe that the debtor was insolvent." RCW 19.40.051.

Fair consideration is given when in exchange for property, "a fair equivalent [of] property

is conveyed or an antecedent debt satisfied." *Osawa v. Onishi*, 33 Wn.2d 546, 557, 206 P.2d 498

(1949). Fair consideration "must be determined from the standpoint of creditors," as "[t]he

debtor might be satisfied to give his assets to a stranger or to exchange them for some worthless

chattel [b]ut the law will not permit him to do so if he thereby renders himself uncollectible to

the detriment of his creditors." *Id.* at 558.

There is a genuine dispute of material fact about whether Loren gave reasonably

equivalent value in exchange for the 2020 transfer based on three issues: (1) the Company's

value at the time of the transfer; (2) the amount of Remaining Preferred Return owed to Michael

in 2020, and the provisions for paying it; and (3) the value of the indemnity provision in the 2020

Transaction.

First, Loren argues that the Company had "millions in negative equity when Mike transferred his 49.9% interest." Dkt. 142 at 8. Bucknell, Loren's expert, opined that "there would not have been any arms-length purchaser, let alone one who would have provided Mike with a valuable indemnity . . . Loren provided *at least* reasonably equivalent value for the Asset he purchased." Dkt. 143-2 at 6. Bucknell explained that arms-length investors "would want to understand the material risks associated with their investment," and given Newcomer's charging order and indications that a "substantial portion of the Company's investment in the Point Ruston project was distressed," no arms-length investor "would have assigned much, if any, value to his LLC interest in the Company[.]" *Id.* at 6–7.

In contrast, the Estate's expert opined that using Michael's 2019 Statement of Personal Net Worth, which lists his asset and liabilities, the 49.9 percent interest in the Company was valued at $8,775,564. Dkt. 138-30 at 12. And the long-term capital gains from the 49.9 percent transfer was reported in Michael's tax return as $9,487,108. *Id.* at 13. Using the asset-based approach in valuing the Company, Van Zandt concluded that "a fair value of a 100 percent interest in M&J was estimated at a range of $17.6 million to $20.0 million, or potentially greater." *Id.* at 16.

As a rebuttal expert, Linebarger opined, "[w]hile I am able to calculate the lower estimate of the range of the opinion of value provided in the Report of Mr. Van Zandt as directly tied to the Statement of Personal Net Worth . . . I am unable to identify the source, if any, for the higher range of the opinion of value." Dkt. 143-3 at 6–7. Linebarger further asserted that Van Zandt "failed to consider all relevant documents many of which would be commonly considered by an appraiser when performing an appraisal." *Id.* at 7.

The difference in valuation opinions based on assets and liabilities the Company had in 2020 creates a genuine factual dispute. The parties' arguments go to the persuasive value of the

evidence, which include their experts' opinions and the documents they relied on to reach their conclusions. A reasonable factfinder could also conclude from the record that Loren considered the value of the 49.9% interest greater at the time of the transaction than he has contended in this litigation. While Loren and Bucknell assert now that Loren undertook the transaction to preserve his father's legacy, *see e.g.*, Dkt. 144-1 at 12, nothing in the parties' contemporaneous communications suggests such a purely benevolent motivation. Instead, a reasonable factfinder could conclude from those communications that Loren and Michael believed the transfer would benefit Loren economically; that Loren engaged in tough negotiations with his dying father to maximize the value he received; that Loren was willing to pay his brother a $1 million bonus because of the value he was receiving; and that Michael did not think he was receiving sufficient consideration for the transfer. *See generally* Dkt. 144-2; Dkt. 144-6 at 6. Considering this evidence also requires weighing credibility—of Loren, of the parties' experts, and of Michael's lawyer and accounting staff. Because credibility determinations are reserved for the factfinder, summary judgment cannot be granted on this basis. *See Neely v. St. Paul Fire & Marine Ins. Co.*, 584 F.2d 341, 344 (9th Cir. 1978) ("In considering a motion for summary judgment, of course, the court decides a pure question of law and is not permitted to weigh the evidence or to judge the credibility of witnesses.").

Second, Loren argues that he gave a reasonably equivalent value for Michael's business interests because Loren personally guaranteed that Michael's trust for his wife and minor children would receive the Remaining Preferred Return owed under the 2014 transfer agreement. Dkt. 142 at 20. In the 2020 Transaction, Michael and Loren agreed that the Company's remaining obligation to Michael was $1,257,170.67. *Id.* at 17. Loren points to accountant Jim Scherbinske's declaration, which stated that based on a Cash Activity Summary spreadsheet he managed, Michael was owed $1,257,170.67. Dkt. 146 at 3. During oral argument, Loren

reasserted that there is no dispute of material fact because $1,257,170.67 came from Scherbinske's spreadsheet. *See* Dkt. 227.

The Estate contests that $1,257,170.67 was the correct amount of Preferred Return owed to Michael in 2020 and argues that the consideration from the 2014 Sale was unlawfully reduced. Dkt. 191 at 11. For example, the Estate questions the validity of the spreadsheet since Scherbinske testified it was not intended to track the Preferred Return and was used to calculate other personal expenses. Dkt. 191 at 12; *see* Dkt. 193-2 at 7. Scherbinske also testified that he simply input numbers that Loren and Michael asked him to add into the spreadsheet. *See* Dkt. 193-2 at 8 ("Q: Did you generally just do what Mike and Loren asked you to do? A: A lot of times, yes. I didn't know what this particular spreadsheet was for, but they asked me to put it together, and they would add stuff to it."). Furthermore, the Estate argues that since Michael's 2019 Statement of Net Worth shows that $11,310,000 was still due from the LMC Family Trust, it is unlikely that the $1,257,170.67 was the correct amount. *Id.* at 12; *see* Dkt. 108-4 at 2. If the Remaining Preferred Return was artificially reduced for the 2020 Transaction, then Loren actually received additional value through reducing the amount he owed for the 2014 transaction, and his personal guarantee of the artificially lower amount is less meaningful.

In response, Loren argues that the Annual Dilution would not entitle the Estate to any amount greater than $5,655,000 because Loren completed ten years of executive management. Dkt. 203 at 10. The Estate counters that Loren's tax records did not report any Annual Dilutions, which is consistent with Michael's report indicating he was still owed $11,310,000. Dkt. 191 at 12; *see* Dkt. 193-1 at 7–9. The Estate also argues that Loren was only entitled to five years of Annual Dilution because he had worked in management for five years when the 2020 Transaction occurred. Dkt. 191 at 12.

1    Regardless of how the Annual Dilution is applied to the Preferred Return, viewing the
2   evidence in the light most favorable to the Estate, a reasonable factfinder could conclude that the
3   company owed Michael a Preferred Return amount greater than $1,257,170.67, and that Loren's
4   personal guarantee of the reduced Preferred Return was not reasonably equivalent value to what
5   Loren gained from the 2020 Transaction. *S.E.C. v. Koracorp Indus., Inc.*, 575 F.2d 692, 698 (9th
6   Cir. 1978) ("[F]or the purpose of ruling on the [summary judgment] motion all factual inferences
7   are to be taken against the moving party and in favor of the opposing party."). The Estate has
8   presented evidence that challenges the validity of the Preferred Return amount of $1,257,170.67
9   based on Scherbinske's deposition and Michael's tax returns. *See* Dkt. 108-4 at 2; Dkt. 193-2 at
10  8. Further, the contemporaneous emails suggest that Loren calculated the Remaining Preferred
11  Return while Michael was critically ill in August 2020, *see* Dkt. 144-2 at 34, and Loren and
12  Scherbinske's credibility is also material to resolving this dispute, *see* Dkt. 144-1; Dkt. 146.
13  Finally, Loren's efforts to structure the 2020 Transaction to minimize the payments going toward
14  the Preferred Return, and maximize his own compensation first, *see* Dkt. 144-2 at 74–75, also
15  suggest that his personal guarantee of those payments is less valuable than contended. Since the
16  true value of the Preferred Return owed to Michael is disputed, summary judgment cannot be
17  granted.
18      Third, Loren argues that he provided reasonably equivalent value in exchange for the
19  transfer because the value of the indemnification provision in the 2020 Transaction "far exceeds
20  the value of the asset that Vaughn claims he received." Dkt. 142 at 20. Loren contends that
21  courts may consider the value of indemnity agreements when deciding whether there was
22  reasonably equivalent value. *Id.* at 18. Loren asserts that in exchange for the transfer, he agreed
23  to extend the indemnity provision to "include all claims or liabilities arising from business
24  disputes to Mike and his estate," which covered "any and all personal guarantees of [Mike]." *Id.*

ORDER DENYING LOREN COHEN'S MOTION FOR SUMMARY JUDGMENT - 19

1    As examples, Loren points to a $17,000,000 payment to settle the Thomsen litigation, *see*

2    Dkt. 144-1 at 13; Dkt. 144-13, and payments made to James Weymouth to settle Michael's

3    personal debt, *see* Dkt. 144-12.

4        The Estate responds that Loren's indemnity claims are illusory and argues that Loren has

5    not proven that the indemnification has any value. Dkt. 191 at 15. Specifically, the Estate asserts

6    that the Estate's liability from the Thomsen litigation was paid by an insurance policy, not Loren.

7    *Id.* at 16; *see* Dkt. 125-12; Dkt. 125-13. Loren, his wife, his mother, and companies of which

8    Loren was already the majority stakeholder were also sued in that litigation, making it difficult to

9    attribute an amount of the settlement to the indemnity provision rather than resolving liability

10   Loren might have faced anyway. *See Starr Indem. & Liab. Co.*, 25 Wn. App. 2d at 388 n.4.

11   Similarly, existing indemnification provisions in company LLC agreements may have already

12   covered Michael's personal liability, *see* Dkt. 11-1 at 57; Dkt. 144-2 at 47 (describing the

13   personal indemnity provision as "belt and suspenders"). The Estate also argues that Loren's

14   alleged payment to Weymouth did not benefit the Estate because Weymouth did not file a

15   creditor's claim against the Estate. Dkt. 191 at 16. Since none of Loren's experts have offered

16   any opinions establishing the value of the indemnification, the Estate argues that Loren cannot

17   establish that Loren gave a reasonably equivalent value for the Company as a matter of law. *Id.*

18   at 15.

19       There is a genuine dispute of material fact as to whether Michael received a reasonably

20   equivalent value in exchange for the 2020 transfer based on the indemnification provision. As set

21   forth above, there are genuine questions as to the scope of indemnification provided to Michael;

22   whether that indemnification was duplicative of existing provisions; and whether the payments

23   made by Loren are truly attributable to Michael's potential liability. These questions must be

24   resolved through testimony, cross-examination, and weighing the credibility and persuasive

ORDER DENYING LOREN COHEN'S MOTION FOR SUMMARY JUDGMENT - 20

value of the evidence at trial. The Estate has raised several factual disputes about whether Loren had provided a reasonably equivalent value in exchange for 49.9 percent of Michael's interest in the Company. And there is also evidence sufficient from which a reasonable factfinder could conclude that Michael believed or reasonably should have believed that he would incur debts beyond his ability to pay as they came do. RCW 19.40.041(1)(b)(ii); *see* Dkt 143-13 at 2 ("after the transfer that is happening now, I am left with little resources to continue payments"). Thus, the Court DENIES the motion for summary judgment on the Estate's UVTA claim based on constructive fraud.

### 2. *Actual fraud under the UVTA*

A transfer may be fraudulent under the UVTA "if the debtor made the transfer or incurred the obligation . . . [w]ith actual intent to hinder, delay, or defraud any creditor of the debtor." RCW 19.40.041(1)(a). In determining actual intent, courts may consider, among other factors, whether:

> (1) The transfer or obligation was to an insider; (2) The debtor retained possession or control of the property transferred after the transfer; (3) The transfer or obligation was disclosed or concealed; (4) Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit; (5) The transfer was of substantially all the debtor's assets; (6) The debtor absconded; (7) The debtor removed or concealed assets; (8) The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred; (9) The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred; (10) The transfer occurred shortly before or shortly after a substantial debt was incurred; and (11) The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

RCW 19.40.041(2).

For reasons explained above, whether Michael received consideration reasonably equivalent to the value of the asset transferred is a disputed fact. *See supra* Sec. IV.A.1. Additionally, the Estate has presented evidence of other factors that support a finding of actual

intent. For example, the transfer was made to an insider since Loren is Michael's son. *See* RCW 19.40.011(8)(a)(i). Shortly after the transfer was made, the Estate became insolvent and incurred a tax burden of $1,456,754. *See* Dkt. 125-14 at 3. Michael was embroiled in litigation with the Thomsens and Newcomer prior to the 2020 Transaction. *See* Dkt 144-1 at 5, 7. Michael effectively absconded after the transfer was executed because it was made for the purpose of transferring the assets before his impending death. *See id.* at 12.

In response, Loren contends that he "acted in good faith when he signed the 2020 Agreements accepting Mike's 49.9% interest in the Company." Dkt. 142 at 19. As evidence, Loren points to his own declaration which states he accepted Michael's interest in the Company to "save some of my father's legacy" and because he was "committed to saving jobs, benefitting the community, and helping to ensure returns for the countless other people and companies that have invested in the Point Ruston project's success." Dkt. 142 at 19; Dkt. 144-1 at 13. As set forth above, the contemporaneous emails surrounding the transfer provide numerous reasons to question the credibility of this assertion and create a genuine issue of material fact.

Under RCW 19.40.081, "[a] transfer or obligation is not voidable . . . against a person that took in good faith and for a reasonably equivalent value whether or not given to the debtor or against any subsequent transferee or obligee." Loren is not entitled to summary judgment on this basis because Loren has not proven he paid a reasonably equivalent value for the transfer or that he took it in good faith as a matter of law.

The Court therefore DENIES the motion for summary judgment on the Estate's UVTA claim based on actual fraud.

**B.    Declaratory Judgment for Undue Influence**

"Undue influence involves unfair persuasion that seriously impairs the free and competent exercise of judgment." *Kitsap Bank v. Denley*, 177 Wn. App. 559, 570, 312 P.3d 711

(2013) (citing *In re Infant Child Perry*, 31 Wn. App. 268, 272–73, 641 P.2d 178 (1982)).

Washington state courts apply Section 177 of Restatement (Second) of Contracts to claims of

undue influence in the context of contract formation. *In re Est. of Jones*, 170 Wn. App. 594, 606,

287 P.3d 610 (2012). "Based on principles of the *Restatement*, courts have determined that

certain circumstances give rise to a rebuttable presumption of undue influence." *Denley*, 177 Wn.

App. at 570 (citation omitted). The three key factors that can create a rebuttable presumption are:

"(1) a confidential or fiduciary relationship between the beneficiary and the testator, (2) the

beneficiary's active participation in the transaction, and (3) whether the beneficiary received an

unusually large part of the estate." *Id.* (citing *In re Melter*, 167 Wn. App. 285, 298, 273 P.3d 991

(2012)). Although these are the most significant factors, "the court should also consider

additional factors such as the age and mental or physical health of the testator, the nature of the

relationship, the opportunity for exerting undue influence, and the naturalness of the will." *Id.*

(citation omitted). Whether the evidence supports a presumption of undue influence "is a highly

fact-specific determination that requires careful scrutiny of the totality of the circumstances."

*Mueller v. Wells*, 185 Wn.2d 1, 11, 367 P.3d 580 (2016).

      "A party claiming undue influence must prove it by clear, cogent, and convincing

evidence." *Denley*, 177 Wn. App. at 569 (quoting *Melter*, 167 Wn. App. at 301); *see also*

*Mueller*, 185 Wn.2d at 10. If the party claiming undue influence establishes the rebuttable

presumption, the opposing party must "rebut the presumption with evidence sufficient to balance

the scales and restore the equilibrium of evidence touching the validity" of the agreement.

*Mueller*, 185 Wn.2d at 15. Ultimately, however, the party challenging the agreement "retains the

ultimate burden of proving undue influence by clear, cogent, and convincing evidence." *Id.*

(internal quotation marks and citation omitted).

A reasonable factfinder could find that the Estate has established all three factors creating a rebuttable presumption of undue influence regarding the execution of the 2020 Transaction— both the original August 2020 transaction and the amendment in November 2020. First, the Estate argues that Loren had a fiduciary and confidential relationship with Michael as the trustee of the LMC Family Trust and attorney-in-fact under several agreements. Dkt. 191 at 19–20. Johnson testified, "I think he relied on Loren to run his business, relied on Loren for a lot of things. He trusted Loren." Dkt. 193-3 at 9. Michael's emails to Loren expressing that he signed the August 2020 agreement in the hospital based on his love for and confidence in Loren also support the existence of a confidential relationship. *See* Dkt. 144-2. Loren and Michael's close professional and familial relationship, and the connection between that relationship and the 2020 Transaction, are sufficient to establish the first factor. *See Denley*, 177 Wn. App. at 572–73.

Second, Loren directly participated in preparing the 2020 Transaction and is fairly characterized as the primary drafter. Dkt. 191 at 20; *see generally* Dkt. 144-2. He was present when Michael signed both the August and November agreements, while Michael was critically ill. Dkt. 144-2 at 64; Dkt. 193-6 at 7. There is no question that sufficient evidence exists for this factor.

Third, a reasonable factfinder could conclude that Loren received an unusually large amount of Michael's Estate, by receiving all of Michael's remaining business interests in a transaction that left the Estate insolvent. *See Denley*, 177 Wn. App. at 577–78. And the factfinder may also consider Michael's declining physical health at the time each document was signed, including Michael's own expression that he signed the August 2020 agreement at Loren's urging, even though he wanted further changes, because he was facing potential imminent death. *See supra* Sec. II.A.2.

ORDER DENYING LOREN COHEN'S MOTION FOR SUMMARY JUDGMENT - 24

The burden thus shifts to Loren to rebut the presumption. To do so, Loren argues primarily that the agreements were fair, that Michael played an active role in the negotiations along with his attorney, that Michael's mental capacity was sound despite his declining physical health, and that the final 2020 Transaction was consistent with Michael's intent. Dkt. 142 at 22–25. These arguments and the accompanying evidence are not sufficient to grant summary judgment to Loren.

First, as discussed above with respect to the UVTA claims, *see supra* Sec. IV.A.1, a reasonable factfinder could conclude that the transfer was not supported by reasonably equivalent value.

Second, as set forth extensively in the fact section of this order, rather than rebutting the presumption, a reasonable factfinder could conclude that Michael's contemporaneous communications during the negotiation support a claim for undue influence. *See generally* Dkt. 144-2. Michael stated expressly that he signed the August 2020 agreement as a convenience to Loren because of his declining physical health, and that it did not reflect all of the terms he desired. *Id.* at 64. Attorney Johnson told Loren that Michael was okay with the amendment only if it reflected his desired changes. *Id.* at 84. And the last clear evidence of Michael's intent for the amended agreement—the November 2, 2020 email attachment—shows that all of Michael's proposed changes were rejected by Loren in the final version, signed by Michael only days before his death, at a time when his son told emergency responders he was experiencing confusion. *See supra* Sec. II.A.2.

It is this discrepancy between the November 2, 2020 draft and the final agreement that led to the Court's incorrect preliminary ruling at oral argument. In Loren's brief, he asserts: "There are no material differences between the signed Amended Agreement and the draft that Mike sent on November 2." Dkt. 142 at 13. To support this proposition, Loren cites an exhibit at

Dkt 143-17. This citation originally led the Court to believe that the redline document at

Dkt. 143-17 represented an actual draft exchanged with Michael during the parties' email

negotiations. Upon further review after oral argument, however, the Court realized that Dkt. 143-

17 (presumably created by counsel) shows in track changes the *differences* between Michael's

last draft and the final agreement. And—in contrast to Loren's characterization, which the Court

finds incorrect at best and misleading at worst—those changes do show several material

differences between the terms Mike wanted and the terms that appear in the final version. *See*

*supra* Sec. II.A.3. All those differences favor Loren.

   Third, while Loren's evidence does establish that Michael was of sound mind for most of

the negotiations, this argument overlooks that (1) Michael could be susceptible to undue

influence based on his fragile physical health even if he was of sound mind, as he himself

explained to Loren in his emails, *see* Dkt. 144-2 at 66 ("I believe I was of sound mind in the

hospital. I also had to reconcile that there was a chance my health could go South and I would

not survive . . . All of that as well as my always enduring love and confidence in you allowed me

to honor your request to sign while you were with me in the hospital"); and (2) there is evidence

that Michael was experiencing confusion around the time he signed both agreements. *See* Dkt.

151-1 at 113 (reporting patient is "groggy and confused after taking oxycodone" and "critically

ill w/ hypoxemic respiratory failure"); Dkt. 173-2 at 28 ("Son also reports that patient seems

more confused the last few days with more pronounced short-term memory problems. He also

had trouble understanding some simple commands.").

   Ultimately, while Loren's evidence shows generally that Michael intended to transfer his

remaining business interests to Loren—a fact that is essentially undisputed—the evidence is also

sufficient for a reasonable factfinder to conclude that the *terms* of that transfer were the product

of undue influence. The evidence shows that throughout the negotiation, Michael pressed for

changes that would reduce credits against the Remaining Preferred Return, speed up payment of the Remaining Preferred Return, and cabin Loren's ability to pay himself before satisfying the Remaining Preferred Return—all with the goal of maximizing value for Michael's wife and minor children. *See* Dkt. 144-2 at 84, 100; Dkt. 144-4. But those changes were all rejected by Loren in the period of time shortly before Michael's death, and in fact the terms became even more favorable to Loren rather than less. *See* Dkt. 11-1 at 82–86. This conclusion could be drawn from the parties' objective, contemporaneous communications, and thus would be supported by clear, cogent, and convincing evidence.

Accordingly, the Court DENIES summary judgment as to the Estate's undue influence claims.

**C.     Breach of Fiduciary Duty**

The parties' briefing on the breach of fiduciary claim is thin. Loren only argues that the Estate's breach of fiduciary duty claim depends on the same evidence presented in support of its UVTA and undue influence claims. Dkt. 142 at 25; Dkt. 203 at 16. Therefore, if the Court grants summary judgment on those claims, Loren asserts that the Court should do the same for the breach of fiduciary duty claim. *Id.* Loren does not contest that he was Michael's fiduciary. *See generally* Dkt. 142; Dkt. 203. On this record, the Court cannot conclude that Loren has shown he is entitled to summary judgment on the breach of fiduciary duty claims as a matter of law. The motion for summary judgment is therefore DENIED.

**D.     The Estate's Affirmative Defenses**

Finally, Loren seeks summary judgment on Carol Vaughn's affirmative defenses against Loren's claims that she breached her fiduciary duty. Dkt. 142 at 26–31. Since by separate order the Court will grant Vaughn's motion to dismiss those breach of fiduciary duty claims on

summary judgment, Loren's motion for summary judgment on the affirmative defenses is DENIED as moot.

## V.    CONCLUSION

For the reasons set forth above, Loren's motion for summary judgment (Dkt. 142) is DENIED.


Dated this 24th day of March, 2025.


Tiffany M. Cartwright
United States District Judge